# LORING MILLER *et al. versus* JEDEDIAH MILLER.

To a writ of entry on the seisin of the demandants' father, to recover an undivided moiety of a shingle-mill and dam, of the land on which they stood, and of the stream of water, the tenant pleaded that the father did not die seised ; and it appeared, that in 1775 the great-grandfather of the demandants, being the owner of the land including the mill stream, by simultaneous deeds conveyed the land on the south side of the stream, together with an undivided moiety of the old mill, to his son Peter, the other moiety of the old mill to his son John, the demandants' grandfather, and the land on the north side of the stream to his daughters. In 1786 the old mill was abandoned, and Peter and John built a new dam lower down, and a grist-mill, at their joint expense, Peter building the southern and John the northern half of the dam, and they occupied the mill as tenants in common until the death of John in 1807. John devised one half of what he owned in the grist-mill to his widow so long as she should remain unmarried, and his son, the demandants' father, was made residuary devisee. There was no evidence that the widow ever entered under the devise, and the demandants' father occupied the mill in common with Peter, from the death of John until 1816, when the dam gave way ; after which the grist-mill never again went into operation. John being told by Peter *that he had no title to the land on which the dam was built, answered that his* father said he might go on and build. The demandants' father died in 1818. Afterwards John's widow died, not having been married again. In 1827 Peter conveyed all his land to the tenant, who rebuilt the dam, removed the grist-mill and erected the shingle-mill on the same site. It was *held*, that the evidence proved a seisin in the demandants' father, of the moiety demanded.

Upon a count in the same writ of entry, to recover a moiety of the site of the old mill above mentioned, it was *held*, that no land being granted *eo nomine* to the demandants' ancestor, if the mill site passed to him, it was as incident to the mill, and the mill being abandoned, the title to the mill site failed.

WRIT of entry, in which the demandants counted on the seisin of their father John Miller on July 4, 1818, and a descent from him to them upon his death in the same year.

By an agreed statement of facts, it appeared, that the declaration contained two counts. In the first, the demandants claimed an undivided moiety of a shingle mill and dam, of the land on which they stand, and of the stream of water, with the privileges, on Fall brook, in Middleborough, being the dam and land on which a grist mill formerly stood. In the second count, they claimed a moiety of an acre of land, more or less, situate on the southerly side of Fall brook, above the premises claimed in the first count, which land is partly covered by water, and partly by an ancient mill dam. On this land the " Old Mill " formerly stood.

The tenant pleaded, that John Miller did not die seised

Miller
*v.*
Miller.

of the demanded premises, and issue was joined on this plea.

On March 30, 1775, the great-grandfather of the demandants, who was the owner of a tract of land on both sides of the stream, which included the demanded premises, conveyed the land situate on the south side of the stream, together with an undivided moiety of the "old mill," to his son Peter Miller. He also, on the same day, conveyed to John Miller, the grandfather of the demandants, an undivided moiety of the "old mill," and to his daughters, Mary and Lucy, the land situated on the north side of the stream. All the sons and daughters were present when the deeds were made. The deed to John was recorded in 1782; and the deed to Mary and Lucy was recorded in 1795.

The land conveyed to the daughters was woodland, and was not occupied by them, except by the occasional cutting of a load of wood, until after the death of the great-grandfather in 1794, when they built a house thereon, which they both occupied till the death of Mary; and since her death, it has been in the possession of Lucy. By a partition made by order of court, in April 1824, between Lucy and the heirs of Mary, all the premises on the north side of the stream were set off to Lucy.

The "old mill" continued in operation until 1786, when it was abandoned or removed, and no mill has been since erected on the site; nor has there been any occupation of the land claimed in the second count, except that a part thereof was overflowed in consequence of the erection of the "new or lower dam." The mud sill of the "old mill" remains, but the overflowing destroys the old privilege.

The "new or lower dam," which is the dam referred to in the first count, was completed in 1786 by Peter Miller and John Miller, the grandfather of the demandants, Peter building the southern and John the northern half of the dam. They also built a grist-mill there. The expenses of constructing the dam and the mill were divided equally between them. The mill was occupied by each of them, every alternate fortnight, until the death of John in 1807. By his will he devised to his widow one half of what he owned in the

grist-mill, so long as she should remain his widow ; and his daughters were to " have equal with their mother " in the half of the grist-mill, as long as they should remain unmarried. John Miller, the father of the demandants, was made residuary devisee, and died in 1818, before the widow. The widow was never afterwards married, and is now deceased.

Peter testified that he often told John, that he had no title to the land on which the lower dam was built ; that John answered, that his father told him that he might go on and build. Peter also testified, that he never heard John claim title thereto.

After the death of the grandfather, John Miller, the father of the demandants, occupied the mill alternately with Peter, until 1816, when the dam gave way, and the mill ceased to work ; and it never afterwards went into operation. After the dam gave way, Peter requested John to repair the mill, but he replied, " that he would not, for he had not two quarts out of a peck of the toll, and he would not repair for that."

On March 2, 1827, Peter conveyed to the tenant all his right and interest in the land on the south side of the stream, and the tenant repaired the lower dam, removed the grist-mill, which was incapable of repair, and built on the same site, precisely, the shingle-mill referred to in the first count, which he has ever since occupied.

The inventory of the estate of John Miller, the grandfather, of May 26, 1808, contains this clause, to wit : " his moiety of the privileges, stream, mill site and corn-mill standing thereon." This clause refers to the mill on the lower dam.

The inventory of the estate of Mary Miller, of September 1817, contains the following clause : " undivided half of the real estate, which she owned with Lucy Miller." The appraisers testified that the administrator showed them the half of the lower mill dam, as to be included in their appraisement ; and that it was so included. The tenant was at that time present, and objected to its being included.

The inventory of the estate of John Miller, the father of the demandants, of October 1818, contains the following clause : " One half of the old grist-mill and privileges, $200."

Previously to the commencement of this action, the de-

Miller
v.
Miller.

mandants requested of the tenant, that they might be admitted as tenants in common with him of the shingle-mill ; but he refused to admit them. It did not appear that any account had been kept of the expenses of building the shingle-mill, nor that the demandants had requested any such account to be exhibited ; nor did it appear what was the income of the shingle-mill since its erection by the tenant.

The case was submitted to the Court, to be disposed of by default, nonsuit or new trial, as the Court should determine that the rights of the parties might require.

*Oct. 25th, 1832.*

*W. Baylies* and *Wood*, for the demandants, cited to the point, that the demandants had acquired a title to the premises claimed in the first count, by virtue of the adverse possession of their ancestors, *Clark* v. *Faunce*, 4 Pick. 245 ; *Poignard* v. *Smith*, 6 Pick. 172 ; *Boston Mill Corporation* v. *Bulfinch*, 6 Mass. R. 229 ; *Ricard* v. *Williams*, 7 Wheat. 59 ; *Jayne* v. *Price*, 5 Taunt. 325 ; *Goodwin* v. *Hubbard*, 15 Mass. R. 210 ; *Newhall* v. *Hopkins*, 6 Mass. R. 350 ; *Wolcott* v. *Knight*, 6 Mass. R. 418 ; *Bailey* v. *March*, 3 New Hamp. R. 274 ; and to the point, that the grant of the " old mill " carried the land on which it was erected, Co. Lit. 5 *b* ; Bac. Abr. *Grant*, *I* 4 ; Shep. Touchst. 89, 93 ; *Miller* v. *Miller*, 13 Pick. 237.

*Eddy*, for the tenant. This is a writ of entry upon an abatement, and actual seisin must be shown, in conformity with the allegations in the writ. *Wellington* v. *Gale*, 13 Mass. R. 489 ; Stearns on Real Actions, 366 ; *Green* v *Liter*, 8 Cranch, 246, 249 ; *Dally* v. *King*, 1 H. Bl. 1. Now it appears, that when the father of the demandants died, his mother was entitled to an estate for life in one quarter of the grist-mill ; the demandants should therefore have brought a writ of entry on intrusion, to recover that part ; but in this declaration no notice is taken of the life estate. Jackson on Real Actions, 6, 210.

The possession of the grist-mill by the father and grandfather of the demandants, will not be construed as a seisin ; it was a concurrent possession with Peter Miller, who was the owner in fee of the land on the south side of the stream ; and where there is a concurrent possession of land, the legal seisin

,s according to the title. *Codman* v. *Winslow*, 10 Mass. R. 146 ; *Commonwealth* v. *Dudley*, ibid. 403 ; *Langdon* v. *Potter*, 3 Mass. R. 215 ; *Waldron* v. *Tuttle*, 4 New Hamp. R. 371. As to the land on the north side of the stream, the possession was not adverse, but permissive, as appears by the testimony of Peter ; and the demandants can acquire no title by means of it. *First Parish in Medford* v. *Pratt*, 4 Pick. 222 ; *Cholmondely* v. *Clinton*, 2 Meriv. 359 ; *Kirk* v. *Smith*, 9 Wheat. 288 ; 2 Starkie on Evid. 508, cites Buller's N. P. 104. Neither did the circumstance of the grandfather's contributing to build the mill give him any legal title in the property. *Manning* v. *Fifth Parish in Gloucester*, 6 Pick. 6 ; *Wells* v. *Bannister*, 4 Mass. R. 514.

As to the second count, we contend, that the conveyance to the grandfather passed an easement only, which was abandoned and lost by non-user. *Hatch* v. *Dwight*, 17 Mass. R. 289 ; *Lawrence* v. *Obee*, 3 Campb. 514 ; *Prescott* v. *Phillips*, 2 Evans's Poth. 136 ; *Hazard* v. *Robinson*, 3 Mason, 275.

WILDE J. delivered the opinion of the Court. This is a writ of entry, in which the demandants demand an undivided moiety of each of two several parcels of land, and count on the seisin of John Miller, their father, alleging, that he died seised in 1818, and that thereupon the premises descended from him to the demandants. The tenant pleads, that John Miller, the father, did not die seised of the demanded premises, and upon this plea issue is joined. The question is, whether the facts agreed maintain the issue on the part of the demandants ; and we are of opinion, that they do, as to the parcel of land described in the first count ; but that they do not, as to that described in the second count.

Oct. 25th, 1833

It is agreed, that in 1786, John Miller, the demandants' grandfather, and one Peter Miller, entered on the first described parcel of land, and erected a corn-mill thereon, which they continued to occupy in common until the death of the grandfather in 1807 ; and that after his death, the demandants' father entered and continued to occupy the premises in common with Peter Miller until 1816, when the dam broke and the mill ceased to operate.

This uninterrupted possession of thirty years' continuance, is

abundantly sufficient to maintain the issue on the part of the demandants, and it is unnecessary for them to go further back in tracing their title.

It has been contended by the counsel for the tenant, that the demandants' grandfather acquired no seisin by his entry and occupation, because he entered under his father, who was the owner of the estate ; but this cannot be maintained on the facts stated.

If the great-grandfather agreed to the grandfather's entry, it was not agreed that he should enter under him, but he entered and continued to occupy in his own right ; and moreover the great-grandfather was not, at the time, the owner of the estate, but had before conveyed it to his daughters ; so that his agreement to the entry and occupation was no more than the agreement or permission of a stranger, and could, on no legal principle, give a seisin to him against the clear intention of the parties.

Then it was argued, that the grandfather devised one half of the demanded premises to his widow while she remained his widow, and that the share thus devised cannot be recovered in this action, although she has since deceased, and the demandants' father was the residuary devisee.  But it does not appear, that the widow ever entered under this devise and became actually seised.  The demandants' father was actually seised of the whole moiety demanded, with the consent of Peter Miller under whom the tenant holds, and this actual seisin is sufficient to maintain the issue on the part of the demandants, if there were no other evidence of title.  The widow's title, whatever it was, has been terminated by her death, and a mere technical objection, which can only turn the demandants round to another action for the recovery of a part of their demand, is not to be encouraged ; and as the tenant, by his plea, has rested his defence on the denial of the seisin of the demandants' father, it is sufficient for the demandants to show his seisin ; and whether it was rightful or not, is immaterial.

As to the parcel of land demanded in the second count, it does not appear that the demandants' father was ever seised. Their grandfather had a grant of a moiety of an old mill

standing on some part of this parcel in 1775 ; but this mill was abandoned in 1786. No land was granted *eo nomine,* and if the mill site passed, it was as incident to the mill ; and that being abandoned, the title failed.

*Miller*
*v.*
*Miller.*

*Judgment for the demandants on the first count.*